U.S. Department of Justice

*United States Attorney*
*District of New Jersey*

*SARA ALIABADI*
*Assistant United States Attorney*

*CAMDEN FEDERAL BUILDING & U.S. COURTHOUSE* *856-757-5026*
*401 Market Street, 4th Floor*
*Post Office Box 2098*
*Camden New Jersey 08101-2098*

September 16, 2026

Honorable Elizabeth A. Pascal
United States Magistrate Judge
Mitchell H. Cohen Federal Courthouse
One John F. Gerry Plaza, Fourth & Cooper Streets
Camden, New Jersey 08101

Re: United States v. Natalie Greene, No. 25-mj-07070 (EAP)

Dear Judge Pascal:

The Government requests an in-person bail review hearing in the above-captioned case, following reports of multiple instances of non-compliance received from Pretrial Services in New Jersey and Florida, as well as additional disturbing information uncovered by the Government.

I. Greene's Criminal Charges

As alleged in the criminal complaint, Natalie Greene conspired to convey false statements and a hoax, and she also made numerous false statements to both federal and local law enforcement officers.

Late at night on July 23, 2025, Greene's co-conspirator called 911 and reported that she and Greene had been attacked by three men when they were out walking on a trail at a nature preserve in Egg Harbor Township. Law enforcement officers responded to the scene, and both Greene and the co-conspirator gave additional information about the supposed "attack."

During the "attack," the men supposedly called Greene by name and referenced her employment with Federal Official 1, whose identity is known to law enforcement. When law enforcement officers located Greene, she was lying in a wooded area just off the trail, with her hands and feet bound together with zip ties. Greene's shirt was pulled over her head and was also tied with a zip tie. Greene had numerous lacerations on her face, neck, upper chest, and shoulder. The words "TRUMP WHORE" were written on her stomach and the words "[Federal Official 1]

IS RACIST" were written on her back. Greene was crying, yelling, and making claims that one of her alleged attackers had a gun.

Greene claimed that one or more of the men who allegedly attacked her said he had a gun and threatened to shoot her. Greene also claimed that one or more of the attackers had held her down and restrained her movement, cutting her and writing on her body. A couple of days later, Greene again described her alleged attack to law enforcement officers, including an agent with the Federal Bureau of Investigation.

The investigation revealed that Greene had not, in fact, been attacked by three men at gunpoint on July 23. Instead, Greene had paid a body modification/scarification artist to deliberately cut the lacerations on her face, neck, upper chest, and shoulder, based on a pattern that Greene herself had provided to the scarification artist. Law enforcement officers recovered zip ties in Greene's car on the night of the alleged attack, similar to the zip ties that had been used to bind Greene's hands and feet. Also, the investigation revealed that, two days prior to the alleged attack, the cellphone of Greene's co-conspirator had been used to search "zip ties near me."

II. Greene's Bail Review Hearings and Condition Modifications

Greene was charged by complaint for her crimes, and she appeared for an initial appearance on November 19, 2025 before this Court. She was initially released on an unsecured appearance bond, under the care of a third-party custodian ("TPC") who was a family member. Greene also was ordered to abide by various pretrial release conditions. Among these conditions were that Greene would be under home detention with location monitoring, with allowance for work, education, treatment, and other approved activities. Also, Greene would receive mental health testing and/or treatment, as directed by Pretrial Services. In addition, one of the pretrial release conditions was that Greene could not possess any firearms, destructive devices, or other weapons. Also, one of the conditions was that Greene was required to advise the Court, the Pretrial Services office or the supervising officer, in writing, before making any change of residence or telephone number.

The following day, November 20, the Court conducted an emergency bail review hearing, after law enforcement officers learned that there were multiple firearms present in the house where Greene resided. During this bail review hearing, Greene's first TPC was relieved of duty and a second TPC was appointed for her. Greene was released to live at a new residence. Additional conditions of release were imposed, including substance abuse testing and treatment conditions. In addition, the Court imposed a release condition that Greene could not use or unlawfully possess a narcotic drug or other controlled substance, unless prescribed by a licensed medical practitioner. As part of this condition, Greene was prohibited from obstructing, attempting to obstruct, or tampering with the efficiency and

accuracy of prohibited substance screening or testing. Greene's travel was restricted to the District of New Jersey, unless approved by Pretrial Services.

On January 28, 2026, at the request of Pretrial Services, another bail review hearing was conducted. During this hearing, Greene's second TPC was relieved of duty, and a third TPC was appointed. Greene received approval to live at a residence in Florida, where, according to the third TPC and Greene's counsel, Greene would have increased job opportunities, as compared with New Jersey.[1] Additional conditions of release were imposed, including a curfew with GPS location monitoring.

On April 7, 2026, Greene's conditions were once again modified. Greene's third TPC was relieved of duty, and the initial, first TPC was re-appointed for Greene, who was now to serve in a remote capacity. Under the current terms of release, Greene is no longer required to live with a TPC. Her curfew and location monitoring conditions remain in place, at the discretion of Pretrial Services. She lives in Florida, and her travel is restricted to the Southern District of Florida and the District of New Jersey for court appearances, unless approved by Pretrial Services.

III. Legal Standard for Revocation and Sanctions

Title 18, United States Code, Section 3148 governs the sanctions to be imposed in the event a defendant violates a condition of his pretrial release order. Section 3148(b) provides that a judicial officer shall enter an order of revocation of the previous release order, and shall order detention, if after a hearing, the judicial officer:

> (1) finds that there is— (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or (B) clear and convincing evidence that the person has violated any other condition of release;
>
> and
>
> (2) finds that—(A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any

---

[1] Based on statements made during court hearings, the Government is aware of multiple potential job opportunities that were considered at the time of Greene's relocation to Florida. However, the Government is not aware of any jobs that Greene actually has worked while she has been living in Florida. Greene appears to lack any support system in Florida, other than the man with whom she is living—who has both a serious criminal history and pending criminal charges, as discussed above—and who Greene appears to have recently done drugs with.

person or the community; or (B) the person is unlikely to abide by any condition or combination of conditions of release.

As set forth below, there is clear and convincing evidence that Greene has violated conditions of her release. A bail review hearing, at the least, is warranted here.

IV. Greene's Violations of Conditions and Other Concerning Behavior

The parties have been advised that Greene has committed multiple violations of her release conditions and has displayed an alarming lack of candor toward Pretrial Services. This, when viewed against the backdrop of Greene's concerning and continuing associations with multiple known criminals, leads the Government to seek yet another bail review hearing for Greene.

For at least the last couple of months, Greene has been romantically involved with—and recently, has been living with—a man who has a serious and lengthy felony history. His prior convictions include identity theft, larceny, and burglary, and he also has pending felony criminal charges in multiple states and a history of drug use. This man used drugs just two weeks ago, apparently while he was with Greene (though allegedly unbeknownst to her), and he unfortunately overdosed on those drugs. Greene allegedly provided life saving measures until the paramedics arrived.

All of this happened around the same time that Greene herself began testing positive for cocaine, thereby violating her pretrial release conditions. Initially, Greene lied to Pretrial Services by denying her own drug use. But Greene's drug use was confirmed by multiple drug tests, and Greene ultimately admitted to the drug use. In total, Greene tested positive on four separate occasions: September 2, September 4, September 8, and September 10. Greene also appears to have taken active steps to conceal her drug use: one of her drug samples was flagged as "diluted," and she reportedly stopped at a smoke and vape shop on the date of that sample, prior to reporting to Pretrial Services.[2] Notably, any attempt to obstruct or tamper with the efficiency and accuracy of drug tests—such as, for example,

---

[2] A police report from earlier this year reflects a witness's complaint that Greene had a cup of urine, whose purpose was unknown. In light of Greene's repeated drug use, her lies about same, her "diluted" sample, and her visit to the vape and smoke shop, the Government believes that Greene may have kept a cup of urine in order to evade drug use detection.

During the same incident that generated this police report, Greene told police that she was keeping a knife inside of a safe at the residence where she was living. This admitted knife possession likely constitutes a separate violation of Greene's pretrial release conditions.

Selected supporting materials, including police reports as well as law enforcement reports regarding selected phone calls, will be provided to the defense and the Court but will not be filed on the docket.

purchasing a kit designed to assist in diluting urine—would be, in itself, a violation of pretrial release conditions.

These pretrial release violations are particularly concerning when viewed in the overall context of Greene's conduct on supervision, and especially, the company that she chooses to keep. Greene's current boyfriend is not the only felon that Greene has been contacting. Records reflect that since at least as early as May 2025—prior to Greene committing the instant crimes—Greene has been in frequent contact with a man who is serving a life sentence in Louisiana State Penitentiary for murder. Greene exchanged approximately 3,000 phone calls with this prisoner between May 2025 and April 2026, on both recorded jail calls and a separate, unrecorded "work" phone line.[3] In addition, records reflect that Greene has received thousands of dollars from this same prisoner.

The recorded phone conversations between Greene and the prisoner in Louisiana State Penitentiary involve various topics, including but not limited to Greene's charged crimes. For example, in a recorded jail call on December 10, 2025, Greene admitted to the prisoner in Louisiana State Penitentiary that the scars on her neck were not due to a "random" violent attack, as she originally claimed. Greene stated, "I didn't tell them about me gettin' scarification. That's the only thing I didn't tell them. And I don't have to tell them that. I don't have to f***ing tell them that."

Greene is well aware that her jail calls with the prisoner are recorded. For example, in a recorded call on August 29, 2025, Greene told the prisoner, "everything is under investigation still" and "don't talk about it. I shouldn't even be talking about it on this recorded line."

In order to circumvent the jail's recording practices and conceal some of her conversations with the prisoner, Greene asks the prisoner to call her via an unrecorded, "work" phone line. This is a particular phone line, known to law enforcement, that prisoners are prohibited from using. For example, on August 12, 2025, Greene told the prisoner, "Like if you can sneak a work call to me like you know then I'll be able to tell you what you need to hear…you know what I'm saying." Similarly, on September 25, 2025, Greene told the prisoner, "I have a really good idea. If you, by any chance, could call me, you know, while you work. I have to tell you something"… "while you're at work"… "you know sometimes you call me at work? Can you do that today? I want to tell you something."

---

[3] Records reflect that Greene exchanged over 2,500 recorded jail calls with this prisoner, between May 1, 2025 and April 6, 2026. In addition, Greene and the prisoner exchanged over 350 calls on the non-recorded, non-sanctioned, "work," phone line, between September 29, 2025 and April 10, 2026.

Notably, on July 23, 2025, the date of Greene's hoax crime, she admitted to police that she has visited this prisoner in jail and that she speaks with him every day.

The volatile nature of Greene's relationship with the prisoner is also concerning. In many of the phone conversations with the prisoner, Greene expresses affection and sexual desire. In other conversations with the prisoner, however, Greene expresses fury, and she threatens to kill the prisoner.

For example, on September 29, 2025, Greene made the following statements to the prisoner:

- "I'm in control now. You better f***ing get your sh*t together!...I am in control now! Do you understand me?!..."
- "I will get you out! I will get you f***ing out and I'll f***ing kill you myself! I'll shove a f***ing knife through your f***ing throat! I don't care if anyone is listening to this!"
- "I don't give a f***! I will kill you my f***ing self the first chance you get to taste a little bit of f***ing freedom just so you can have that freedom and I'll f***ing murder you so you can be like 'oh oh I'm never gonna get that freedom!' You got to taste it just enough and I'll f***ing kill you! Do you understand?!..."
- "Get on your f***ing knees, b*tch! Get on your f***ing knees! Get on your knees! And beg for me back! Get! Beg for me back! Beg for me back!"
- "Go in your f***iing bed and shove your finger up your *ss and call yourself a little b*tch! And remind yourself who the f*** I am!"

The Government acknowledges that the above statements may not rise to the level of a "true threat," as contemplated under federal law, and they took place nearly a year ago. The Government only recently learned of these statements and notes them to the extent that they may lend further context to Greene's recent pretrial release violations and support the Government's request for a bail review hearing.

Respectfully,

ROBERT FRAZER
United States Attorney



By: SARA A. ALIABADI
PATRICK C. ASKIN
Assistant U.S. Attorneys